**UNITED STATES of America**

v.

**Forrest E. WATERS, Jr.; Marlon Ford Waters; Diane M. Burlingame.**

**No. CR 93–AR–295–S.**

United States District Court,
N.D. Alabama,
Southern Division.

April 22, 1994.

**1552**

Albert C. Bowen, Jr., Clyde E. Riley, Beddow Erben & Bowen, Birmingham, AL, for defendants Forrest E. Waters, Jr. and Marlon Ford Waters.

J. Mark White, White Dunn & Booker, Birmingham, AL, for defendant Diane M. Burlingame.

Claude Harris, Bill L. Barnett, U.S. Atty's. Office, Birmingham, AL, for plaintiff U.S.

### *MEMORANDUM OPINION*

ACKER, District Judge.

The court has for consideration motions for judgment of acquittal filed pursuant to Rule 29, F.R.Cr.P., by defendants, Forrest E. Waters, Jr. (Forrest), Marlon Ford Waters (Ford) (father and son) and Diane M. Burlingame (Diane) (their secretary), at the conclusion of the evidence in the above-entitled criminal case. Defendants' said motions were taken under advisement and not ruled on. The jury thereupon rendered a verdict of guilty as charged in both counts of the indictment. Count One charged Forrest and Ford with a Hobbs Act violation in the form of a wrongful threat of economic harm allegedly leveled at LAP Construction, Inc. (LAP), a subcontractor on a multifamily residential complex called Wildforest being developed by Forrest and Ford. Count Two charged Forrest, Ford and Diane with the illegal laundering of $8,000 allegedly obtained

from LAP by virtue of the Count I extortionate threat.

## Introduction

This court seriously considered granting defendants' Rule 29 motions when made, and not submitting the case to the jury. The court now wishes it had done so. If the court had taken the time after the evidence was concluded to think the matter through and to do a little research, it would have granted the motions for acquittal, particularly the motion of Diane, the alleged laundress. In the opinion which follows, the court will explain why it should have taken the case away from the jury.

■ Everything which will hereinafter be said must be underlined by the general and well-accepted rule that penal statutes are strictly construed in favor of the accused. To this date no court has wandered very far from this rule of statutory construction. There is no exception to this rule for interpreting or understanding the particular criminal statutes here involved. This court finds no reason to change this rule of construction or to lighten the Government's burden of proof, even assuming that these defendants are, as the Government describes them in the last paragraph of its post-trial brief, "leeches". The entire case presented to the grand jury on December 3, 1993, consists of 19 pages of hearsay, double hearsay, and triple

hearsay from one FBI agent. This court fully comprehends that the burden of proving "probable cause" for the purpose of obtaining an indictment is much easier to meet than the burden of "proof beyond a reasonable doubt" necessary to obtain a conviction. For instance, although there was no evidence whatsoever presented to this particular grand jury to suggest that the alleged extortionate threat adversely affected commerce (one of the essential elements of a Hobbs Act violation), a court does not look behind the indictment to see if the Government met the burden of proving to the grand jury that probable cause actually existed. As the Supreme Court said in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974):

> [T]he validity of an indictment is not affected by the character of the evidence presented. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence.

414 U.S. at 344, 94 S.Ct. at 618. The Assistant United States Attorney's last remark to this grand jury was: "It took a little longer than five minutes, but it was interesting." The court agrees that the presentation to this grand jury was interesting and is worth a careful perusal.[1] For instance, on page 9

---

1. *Jim Kiel*

a witness of lawful age, called before the Grand Jury and first being duly sworn by the Foreman, was examined and testified as follows:

MR. BARNETT: They said you-all were sitting in here waiting, so we decided, hey, we've got a case. They didn't remember out there, but you-all did.

Turn to Page 6 on your docket. Page 6, Grand Jury No. 6, Forrest E. Waters. And that next name is Marlon—M–A–R–L–O–N—rather than I–O–N. And the name to add is Diane—D–I–A–N–E—Burlingame, the usual spelling—B–U–R–L–I–N–G–A–M–E—Burlingame. *EXAMINATION BY MR. BARNETT:*

Q Special Agent Jim Kiel is with us this morning to tell you a little bit about the background of this case. Jim, let me see if I can get us into this way.

You investigated a complaint that came from a fellow who ran a business called LAP Construction, did you not?

A That's correct.

Q And in your investigation and interviews with him, you determined that back in August—around August of 1992 he began talking with the Waters, and that's Ford and Marlon—I'm sorry, Forrest and Marlon, and Forrest is the father?

A Yes.

Q A father and son, folks, who are limited partners in a project that they were talking about getting constructed by the name of Wild Forest Apartments located over in Homewood, Alabama?

A Yes.

Q And as the year progressed and then they got into the early part of 1993, there came a point in time where they came to the owner of LAP Construction and presented him with plans for the work that they wanted him to bid on?

A Yes. Well, there were several presentations of plans.

Q There were other projects, too?

A Yes.

Q But there came a time when ultimately he sat down with them and presented them with his proposal for the excavation work and site prepa-

# 1554

Note 1—Continued

ration work for the ground that would be the site for the complex?

A That's correct.

Q And was that Ford or was that Forrest that he gave it to?

A Ford.

Q All right. Was Forrest present at that time?

A At the meeting where the first figures were done, I don't believe so.

Q All right. And at the time those first figures were given, he turned over to Ford what his breakout was with regard to cost on each aspect of the project that he would be doing and site preparation and excavation work?

A That's correct.

Q And then Ford pulled out a piece of paper or flipped that over and put a multiplier to it and changed all those figures by increasing it a percentage amount which he said was to be paid back to him for getting the job for LAP Construction?

A He said that he was going to use a multiplier on each phase and that the increase, the overall increase was something that should go back to them.

Q And then they gave that to the secretary, who was Burlingame, and she typed it up as the new proposal to be submitted to the contractor?

A Yes.

Q LAP was to be the subcontractor?

A Yes.

Q And from your investigation, did you determine that, in fact, was submitted to the general contractor as the cost?

A Well, no, because in the meantime they found out that HUD wouldn't insure the financing for rock work. That's rock removal, blasting and drilling. So, they had to back that amount out of what they submitted to the contractor.

Q Now, were there any conversations that LAP Construction and who is—is that Timothy Pfeiffer?

A Yes. He's an employee of LAP Construction.

Q Just an employee, or is he one of the principals of it?

A Well, his wife—LAP stands for Laurie Ann Pfeiffer, which is his wife. He has the company. He runs the company, but it's in her name, so he's not really a principal of the company.

Q Did he have any further conversations with Forrest Waters about what was expected for LAP to pay them by virtue of them having gotten them the job over at the apartment complex?

A Yes, they had conversations from June of '92 all the way through the obtaining of the contract in June of '93 because prior to January of '93 Tim Pfeiffer was working for the railroad and construction was a part-time thing for him.

And there came a point where both Ford and Forrest Waters were telling him this project is going next month, you know, you've got to be full time, getting ready with the plans and the equipment and everything. so, in December of '92, he quit his job with the railroad and started working on this project full time.

Q Did there come a time that he had to borrow money from the Waters in order to get enough capital to amass the equipment he had to get together?

A Yes. when he got the contract or the subcontract with Consolidated Construction for the earth work and site preparation, he needed money to purchase bales of hay, which is called—it's used to keep direct from running off into somebody else's property.

Q Erosion control?

A Yeah, some type of erosion control and a couple of other things. Some fence posts with black polyurethane plastic to stretch over there that goes behind the bales of hay. He had to borrow $1,500 from the Waters to even start.

Q All right. But apparently—I think you just said that that contract was executed in June of '93?

A Yes.

Q And the contract he had was with?

A Consolidated Construction.

Q Construction, all right.

Now, there came a time that he was able to pay them back the money that he had borrowed?

A Yes. As soon as he got his first draw from Consolidated for the Wild Forest project, he then had the $1,500 to pay back.

Q Now, did you also determine that he, in fact, did pay a sum of money, some $8,000, as a payment toward whatever this percentage drawdown was calculated to be by the Waters?

A Yes, That occurred after his third draw in this project from Consolidated. He then had some extra money, and that's when he made a payment of $8,000 to the Waters.

Q From your investigation, did you determine what happened to that $8,000? First, was it in a check that was drawn payable to Burlingame?

A Yes. The Waters told him to issue a check from LAP Construction to them, but they didn't want it in their name, so they told him to put it in their secretary's name, Diane Burlingame.

And Pfeiffer asked, "Well, how is he going to put this on his books, what kind of expense was it going to be?" And they said, "Well, just put on there that it's for computer work and setup of your office space, and then we'll get you an invoice to that effect."

Q Now, had she done anything for LAP Construction, setting up an office or doing anything?

A No.

Q Did Pfeiffer actually deliver it to Burlingame?

A Yes

Q And where did that pass take place?

A In the offices of MFW, which are on Alford Avenue in Homewood.

Q MFW, is that the Waters' business?

A Yes. It stands for Marlon Ford Waters.

Q Did he get any kind of receipt from them or any notation of the payment?

A No.

Q But he did it by check?

A Yes.

Q Did you determine what she did with the check once she got it?

A Yes.

Q What did she do with it?

A Through a Federal Grand Jury subpoena, we found that she had cashed the check at South-

Note 1—Continued

Trust Bank in Hoover and used $6,000 of the 8,000 to buy a cashier's check made payable to Walter Cummings, and then she kept the other—took the other 6,000.

And in an interview of her, she told us that she took—I believe I said 6. The other 2,000, not 6. The other 2,000. In an interview she said she took the other 2,000, went to another bank—she thought it was First Alabama, but she wasn't sure—and got some money orders or other cashier's checks in smaller denominations and then took all of those instruments back to Ford Waters.

Q Now, there came a time after you had talked with Mr. Pfeiffer that you consensually wired him with a recording device, did you not?
A Yes, I did.
Q And you were thereby able to record conversations which he had with the Waters about the payment of additional moneys?
A Yes.
Q If you could, could you thumbnail sketch what was said in summary fashion by the Waters in various conversations that were had after the payment of the first $8,000 by Mr. Pfeiffer?
A As Pfeiffer or LAP Construction did work on the project, they would submit their invoices to Consolidated Construction for X number of hours of earth moving and items like that.

Then they would get a draw. Their total contract with Consolidated was in excess of $600,000, and they would get a draw each month from Consolidated depending on how much work they had done.

And the conversation that the Waters were having with Tim Pfeiffer had to do with when he was getting his draws and how much of his draws he was getting. In other words, the dollar amount, and then how much of that was to go to them. And they had it calculated somewhere in the neighborhood of 23 percent that they should be getting from each draw.

And his conversations with them dealt with the fact that he didn't do the books for LAP Construction because it was his wife's company, and he needed some justification to be issuing these checks for $8,000.

And the one they were asking for after the July payment was going to be in the neighborhood of $15,000. That's what they thought their percentage should be.

And he told them, he says, "I can't just write you a check because, number one, I don't write the checks and, number two, my wife's not going to write a check unless she's got some kind of invoice." And they said, "Well, we'll do invoices for you. Don't worry about it, don't worry about it, but we need our money." And he said, "Well, I need an invoice." "Well, you didn't tell us this earlier."

So, then they got mad at him and they hollered at him a little bit about it was their money and they wanted it and they were counting on him because they were going to do lots of other work like this.

They had another project called Lake House that was in the approval stages, also to be a HUD financed—a HUD insured project. They had two or three other projects that they named, and they told him they were going to get him in on all these other projects and he would make a lot of money, but right now they had to have their money, it was theirs and they wanted it.

Q Did they ever indicate what would happen to him if he didn't pay the money?
A He asked them a couple of times what would happen, what's going to happen if I can't get it, and they beat around the bush and said, "Well, Tim, I can't tell you what's going to happen, but we're counting on you and we're counting on this money for Lake House, and you know that we can do a lot of things down the road." They implied to him that he wasn't going to get any other work from them or through them if he didn't come up with this 15,000.

Q Was there ever any admission by either of the Waters on tape that they knew what they were doing was illegal?
A Yes. On two occasions Forrest Waters stated that they knew this was illegal when they started it back in December, but that doesn't change anything and they still needed their money.

Q Now, it got kind of tense right toward the final meeting, did it not, about let's get this payment, we've got to have it?
A Yes, it did.
Q And there was, then, a payday that was arranged?
A Yes.
Q But you went to that payday meeting, did you not, along with several other agents of the FBI?
A Yes, I did.
Q And identified yourselves?
A Right.
Q And then proceeded to interview Forrest Waters?
A We interviewed Forrest Waters.
Q Take them one at a time.
A I personally interviewed Forrest Waters.
Q And what did he say in his interview?
A He said that they were seeking to get money from LAP Construction, but that that was just the way business was done. There was nothing wrong with it, there was nothing illegal about it. It wasn't extortion, that that's just business, that's how business is.
Q Did you take the opportunity at that point to tell him that he'd called it illegal himself on earlier tapes you had?
A No, I did not.
Q Did other agents talk with Ford Waters?
A Yes, they did.
Q And what is your understanding as to what he had to say?
A Let me back up just a minute on Forrest.
Q All right.
A Forrest admitted—Forrest said that he had a company, another company that he was doing business with by the name of DC, Incorporated. And the history on that was eventually the Waters did give Tim Pfeiffer some receipts for the first $8,000, what was to be the first $8,000, and they were invoices from DC, Incorporated, to LAP Construction.

Note 1—Continued

And it was for—it stated on there engineering work and site prep work, which they were just phone receipts that they said they had Diane Burlingame prepare. The receipts were signed by R.L. Hulsey.

We asked Mr. Waters, Forrest Waters, if he knew of a DC, Incorporated, and he said yes, it's a construction company that does work for him on occasions. I've not been able to find any DC, Incorporated, or an R.L. Hulsey.

When we interviewed Ford Waters at the same time,—other agents were interviewing Ford Waters while I was interviewing Forrest Waters— Ford Waters said he never heard of DC, Incorporated, that they weren't asking for any money from Pfeiffer or LAP and he didn't know anything, basically.

Q What did Ms. Burlingame say about the $8,000 check she got from LAP?

A She was being interviewed by other agents at the same time the Waters were being interviewed, and in the first half of the interview, she said she didn't know anything about an $8,000 check, had never gotten any money from Tim Pfeiffer, knew of LAP Construction but there was no moneys between them and her.

The agents interviewing her told her they didn't believe her and that she needed to tell the truth, and she said halfway through the interview, okay, I did get an $8,000 check from Tim Pfeiffer, and in the memo portion of the check it said for computer setup and office. I didn't do any office work. I didn't do any computer setup for him.

And when I got the check, Ford Waters told me to go get a $6,000 cashier's check made out to Walter Cummings, and then he said to get a couple of other smaller denomination checks with the remaining 2,000 and bring them back to him, and she said she did that.

MR. BARNETT: Any questions, ladies and gentlemen?

A JUROR: Where does this name Walter Cummings come in?

THE WITNESS: Diane Burlingame said that Walter Cummings was somebody that the Waters owed money to, and that's all she knows. And I have been unable to locate a Walter Cummings.

The reverse of the $6,000 cashier's check, though, is endorsed. The cashier's check is made out to Walter Cummings that we got through the Grand Jury subpoena, and it is endorsed by a Walter Cummings, but it doesn't—I can't read it to see what bank it was negotiated through. Somebody told me he may be a resident of Georgia.

MR. BARNETT: Any other questions?

THE GRAND JURY: (No response.)

MR. BARNETT: We will propose for your consideration a two-count indictment.

Count 1 would charge a violation of Title 18, United States Code, Section 951, which is known in the vernacular as the Hobbs Act.

The Grand Jury charges:

Paragraph 1, at all times material to this indictment, the partnership known as Wild Forest was developing an apartment complex known as Wild Forest Apartments in Homewood, Alabama;

Paragraph 2, at all times material to this indictment, Forrest E. Waters, Jr., and Marlon Ford Waters were partners in said partnership;

Three, at all times material to this indictment, the general contractor for the building of the apartments was Consolidated Construction Company;

Four, at all times material to this indictment, LAP Construction, Inc., hereinafter LAP Construction, was a contracting company that was engaged in excavation and site preparation work for construction projects;

Five, during or about June of 1993, LAP Construction subcontracted with Consolidated Construction Company to do certain excavation site preparation work at the Wild Forest Apartments project in exchange or in excess of $600,000;

Six, at all times material to this indictment, Forrest E. Waters, Jr., and Marlon Ford Waters, had discussions with LAP Construction concerning LAP Construction doing additional work for what was known as the Lake House Project and other projects;

Seven, in or about July and August of 1993 in the Northern District of Alabama, Forrest E. Waters, Jr., and Marlon Ford Waters did unlawfully obstruct, delay, and effect and attempt to obstruct, delay and effect commerce as that term is defined in Title 18, United States Code, Section 1951, by extortion as that term is defined in that same code section in that the defendants did willfully obtain and attempt to obtain the property of LAP Construction with its consent, said consent being induced by the wrongful use of fear of economic harm in that the defendants did convey to LAP Construction threats to interfere with said company's ability to obtain any further work; that is, work on the Lake House and other projects unless LAP Construction gave to the defendants a percentage of the money the company was to be paid for its work, a percentage of the money that LAP was to be paid for its work, which amount was and would have been approximately $150,000 to be paid over.

Count 2 would include Burlingame along with the other two defendants. This charge is the money laundering aspect, and that is what you do with the proceeds. If you get money from an illegal source, which this qualifies as since it's extortion of proceeds, then how you handle that money, and in handling that money disguise its true identity, that would then be a violation of Title 18, Section 956(a)(1)(b)(9).

The Grand Jury charges that between early 1993 and August of 1993, more exact dates being unknown to the Grand Jury, within the Northern District of Alabama, Forrest E. Waters, Jr., and Marlon Ford Waters and Diane M. Burlingame, each aided and abetted by the other, did knowingly and willfully conduct and attempt to conduct a financial transaction; to-wit, the encashment of an $8,000 check dated July 13, 1993, which involved the proceeds of a specified unlawful activity; that is, the interference of interstate commerce as defined in Title 18, United States Code, Section 1951(a); that is, the extortion of $8,000 from a subcontractor to prime

of the transcript the Assistant United States Attorney asked his only witness about "various conversations after the payment of the *first* $8,000 by Mr. Pfeiffer [Phifer]." (emphasis supplied). This question implied that there were subsequent payments made by Phifer to the Waters. However, from the evidence at trial Phifer made only one payment of $8,000, and that was all that the Government charged in the indictment. The only reason the grand jury transcript is in the record is that it was furnished as *Jencks* material. As stated, this court is fully aware that grand jury presentations are usually routine. Grand juries rarely, if ever, say, "You'll have to give us more than that, or we won't indict!" This grand jury was tractable. Whether or not it found this particular presentation "interesting", this court finds it academically interesting.

## *COUNT ONE*

The first non-academic question to be addressed is not whether there was enough evidence upon which Forrest and Ford could be indicted but whether there was enough evidence upon which they could be convicted of the charges contained in Count One. In trying to provide an answer to this question, the Waters make several telling arguments. The court will discuss only those which it finds worthy of examination.

### *Wrongful Use of Fear of Economic Harm*

■ Paragraph 7 of Count One describes the Waters' alleged extortionate conduct as the "*wrongful* use of *fear of economic harm*, in that the defendants did convey to Lap Construction threats to interfere with said company's ability to obtain further work." (emphasis supplied).

Some courts of appeals would hold that a body-wired confidential FBI informant like Phifer, who, in fact, did not *actually* fear any economic harm and who could not have been

an *actual* subject of intimidation, cannot provide the essential element of fear. However, the Eleventh Circuit has held to the contrary. Compare *United States v. Brecht*, 540 F.2d 45 (2d Cir.1976), and *United States v. Capo*, 817 F.2d 947 (2d Cir.1987), which require an *actual* apprehension of anticipated harm by the *victim*, with *U.S. v. Quinn*, 514 F.2d 1250 (5th Cir.1975), and *United States v. Haimowitz*, 725 F.2d 1561 (11th Cir.1984), which hold that the issue is looked at not through the eyes of the victim but through the eyes of the *defendant*, and if the threat was reasonably calculated to instill fear of economic harm, the burden of proving this element is met. Therefore, the mere fact that Phifer was working for the FBI at the time Forrest and Ford threatened him with the loss of future jobs does not provide an escape route, unless the Eleventh Circuit can be persuaded to agree with this court's tentative belief that a serious distinction should be recognized between a threat received by a person who has no actual fear of economic harm and a threat received by someone, like Phifer, who had actually expected to *benefit* from the body-recorded threat. Here, by cooperating with the FBI, Phifer planned to extricate himself from what he felt was an unprofitable deal, and his plan has succeeded. Phifer's motivation arguably makes a difference, and in this court's opinion, it provides a reason for finding this factual situation more amenable to an application of the rationale of the Second Circuit than to that of the Eleventh Circuit. However, as it now stands this court feels bound to disagree with the Waters' contention that the Government failed to prove a threat of economic harm. While sorely tempted by the marked factual difference between this case and the cases which created the binding Eleventh Circuit precedent, this court will not stray from *stare decisis*, especially when it is unnecessary in this case to do so.

---

Note 1—Continued
contractor for the construction of a housing project, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity; and that while conducting and attempting to conduct such financial transactions knew that the money involved in the financial transaction

represented the proceeds of some form of illegal activity, all in violation of Title 18, United States Code, Section 956(a)(1)(b)(9).

Any questions?

THE GRAND JURY: (No response.)

MR. BARNETT: We thank y'all. It took a little longer than five minutes, but it was interesting.

■ A troublesome, but dispositive, question is whether the threat alleged in Count One was "wrongful," the statutory term necessarily used. Of the varying stories told by the witnesses as to the substance of the evolving agreement between the Waters and Phifer, the version most damaging to the Waters must be the one assumed to exist for the purposes of Rule 29 analysis. Although the various versions are similar, there are enough interpretations and nuances that this court respectfully declines to attempt to outline all possible variants. The following colloquy, which occurred during the Rule 29 argument, basically reveals the Government's position on this subject:

THE COURT: Mr. Barnett, do you want to talk on that subject a little bit?

MR. BARNETT: I'd be happy to, Your Honor.

It looks to me like the only thing that we haven't covered is Rule 29 as to the evidence must be construed in a light most favorable to the government. And what have you got? And we can take it back. There are any number of ways of approaching it, but let's just do it from the bar of the word "get-go."

It's the state of the mind of the victim that makes the early agreement significant, because that sets the pace in his mind, here's a window of opportunity to get hundreds of thousands of dollars in contracts if I will agree to the kickback. If I will agree to the kickback on the front end of it, I ain't getting none.

THE COURT: And that's not charged.

MR. BARNETT: Of course, it's not charged, except to the degree that it sets the state of mind of the victim. And it sets up the unlawful conduct, and he knows in his mind they've got the capacity, whatever the connection is that they say they have at HUD, to get HUD work.

He's doing piecework with the railroad company, paid to go up and down the line. He's done some contracts, but he hasn't done anything like a hundred thousand dollars or these multiple hundred thousand dollar contracts. And they say you kick it back to us, and the percentages that we talked about, when we put the multipliers on it, and that difference is ours, then we'll pull your train. You can put your car right there behind our locomotive and we'll take you right on through to economic enrichment. But if you don't do it, you're not going to—

THE COURT: Nothing you have told me yet is charged.

MR. BARNETT: Exactly. He says, okay, they can start it. Then they can't do it. Our train ain't going to run on this line. We've got to get another general partner. But we know we can't go with this one because we can't get the rock charged. But if you'll promise to pay us $150,000 out of your contract—

THE COURT: Not 23 percent.

MR. BARNETT: Well, it reckons out to it. We can say 23 percent or we can say 100,000, 150,000. It figures about the same, which is the way they said it to him.

THE COURT: So we're not sure of what the meeting of the minds was. Is that the difference between the first contract, the first agreement and the second one? Or is this all either alternative, the second one?

MR. BARNETT: Well, if you listen to Mr. Bowen, you never will get it reckoned out. But if you listen to what the victim said with regard to how much it is, you can go with that or you can go with what Forrest Waters said when he talked to the FBI. It comes out the same, 150,000.

THE COURT: Which is what you're looking for?

MR. BARNETT: Yes, sir. 150,000 is what we're looking for. We've two sources. And obviously that's looking at it from the government's viewpoint, not the defendants'. You've got two people agreeing to it. That still is not what is charged.

THE COURT: Well, the hundred and fifty is mentioned.

MR. BARNETT: It's mentioned. But that agreement is not the one that's charged.

Then you get down to July, and the first draw comes through, and Ford comes along and says, by golly, we want 23 percent of that draw. And Phifer says I can't

pay you 23 percent of $55,000. I'd shut down. Well, they agree on an $8,000 amount, and the check was written off of LAP.

It must be kept in mind that Count One does not charge criminal misconduct by Forrest and Ford vis-a-vis their prime contractor, or vis-a-vis any construction lender, or vis-a-vis the Department of Housing and Urban Development. Neither does the Government charge that the initial so-called "kickback" agreement between the Waters and Phifer, whereby the Waters were to participate in LAP's profits from LAP's site preparation work on the Wildforest project, constituted "extortion". The court allowed into evidence events and conversations which took place prior to the dates of the extortionate conduct alleged in the indictment *only as background.* The Government used this evidence, with success insofar as the jury was concerned, to characterize subsequent, specific conduct by Forrest and Ford as taking a "kickback". However, the original agreement by and between Phifer and the Waters was obviously not illegal under any version of it. Otherwise, the Government would have charged that the agreement *itself* was extortionate. The agreement did constitute questionable business practice, and it may have been immoral or "extortionate" in the dictionary sense of that term. But the United States has not invoked any *statute* which would criminalize the oral understanding itself. There is no law to prevent the Waters, as developers, from participating in a subcontractor's profits by prior agreement. Phifer admits that he fully understood from the start that in exchange for the Waters' help in getting LAP the site preparation sub-contract, whatever other promises have been involved, (such as an alleged but disputed indemnity against unanticipated rock removal costs, inasmuch as LAP could not obtain a performance bond), LAP would have to share its profits with them. If this agreement was unwise, or was unprofitable, or was grossly unfair, it was entered into by Phifer with his eyes wide open. He could not have been "wrongfully" threatened *ab initio.* To repeat, if there had been a statute that made the overall agreement criminal, the Government would surely have exploited it. Its absence from Count One tells a great deal about a bad deal.

Assuming the impossible, namely, that any conversations that took place before the dates of the specific extortionate conduct described in the indictment could have been illegal, such conversations did not take place during the time frame alleged in the indictment and clearly cannot form any basis for conviction. These conversations came into evidence only as the background underlying the $8,000 transaction. Without more, that evidence did not constitute proof that the $8,000 was paid in response to a Hobbs Act threat.

■ Congress included the word "wrongful" in the Hobbs Act because not every threat of economic harm is *wrongful.* The fact that Phifer recorded the Waters' "confession" that their preparation of the fake invoices that Phifer demanded of them was "illegal" did not make "wrongful" the entirely separate conduct described in Count One. Whether or not it is a shameful fact, it is nevertheless a fact that threats of economic harm are used every day as tools in the business world; only a few of them are extortionate. This is the holding of *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), wherein the Supreme Court said:

> The Government contends that the statutory language unambiguously and without qualification proscribes interference with commerce by "extortion," and that in terms of the statute, "extortion" is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear...." Wages are the "property" of the employer, the argument continues, and strike violence to obtain such "property" thus falls within the literal proscription of the Act. But the language of the statute is hardly as clear as the Government would make it out to be. Its interpretation of the Act slights the wording of the statute that proscribes obtaining property only by the "wrongful" use of actual or threatened force, violence, or fear. The term "wrongful," which on the face of the statute modi-

fies the use of each of the enumerated means of obtaining property—actual or threatened force, violence, or fear—would be superfluous if it only served to describe the means used. For it would be redundant to speak of "wrongful violence" or "wrongful force" since, as the Government acknowledges, any violence or force to obtain property is "wrongful." Rather, "wrongful" has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be "wrongful" because the alleged extortionist has no lawful claim to that property.

410 U.S. at 398–402, 93 S.Ct. at 1009–10. As used in the Hobbs Act, the word "wrongful" is no more superfluous than is the word "unlawful" in 18 U.S.C. § 1703(a), which recognizes a distinction between *questionable* conduct and *unlawful* questionable conduct. *See U.S. v. Scott*, 993 F.2d 1520 (11th Cir. 1993), in which the Eleventh Circuit clearly agrees with the idea that all terms in a criminal statute are presumed to have a purpose. Assuming that the threats of economic harm body-recorded by Phifer were simply "mean" rather than "wrongful," then the subject $8,000 was not "extorted" as that term is used in the Hobbs Act. If the money was not extorted, then Diane could, with impunity, put the $8,000, which may or may not have been intended for her, in a secret Liechtenstein bank account in the name of a fictitious uncle, so long as she paid her income taxes on it, which, without contradiction, she says she did.

The Government's ineffectual answer to the Waters' argument seems to be that the deal between the Waters and Phifer, whatever it was, was such a poor deal that LAP could not possibly · have profited from it. And yet, Phifer had no trouble admitting that he entered into the agreement. Only when the Waters began to use economic pressure as a means of enforcing the agreement did Phifer go to the FBI for help. The indictment itself charges that LAP was to give the Waters "a percentage of the money Lap Construction was paid for its work, which said amount was and would have been $150,000," but this agreement conspicuously was not labeled in the indictment as a Hobbs Act violation. The Government neither alleged nor attempted to prove that the Waters were guilty of extortion on top of extortion. The fact is that Phifer got rid either of a $150,000 obligation and/or a 23%-of-the-profits obligation for a mere $8,000 (that is, unless the $8,000 came from the FBI instead of from the prime contractor), in addition, of course, to cooperating with the FBI at no risk to himself. LAP still has its site preparation, sub-contract on Wildforest and has ostensibly shed its obligation to pay what Phifer promised to pay the Waters. Going to the FBI was easier and cheaper than going to an equity court to have an unconscionable agreement declared unenforceable, and perhaps losing the sub-contract.

■ The Government has pointed to no case or authority, either binding or persuasive, which holds that a threat of economic harm made for the purpose of enforcing a contract, even if that contract is unconscionable, constitutes the sort of threat of economic harm proscribed by the Hobbs Act. The Government's post-trial brief concedes, just as did the indictment, that there was some sort of profit sharing agreement between Phifer and the Waters which antedated any threat of a loss of future business. Therefore, the threat not to give LAP future work, used as leverage to obtain compliance with this admitted agreement, could not be "wrongful", and if it was not "wrongful", it was not extortionate under the Hobbs Act definition. The Waters were simply not guilty of the Hobbs Act violation alleged in Count One.

### Was There Adequate Proof That LAP was Threatened?

■ If this court were giving free legal advice, it would advise the Waters not to sue LAP for breach of an oral contract, not only because they would run into LAP's unconscionability argument, and into a vagueness argument, and into a possible statute of frauds problem, but because the Waters make a strong case in this court that Phifer could not have bound LAP, and if LAP was not bound, then, of course, there was no enforceable agreement. Count One charges

that the *victim* was "LAP Construction, Inc.," which was and is a corporation, an entity separate from Phifer and in which Phifer was never a stockholder, never a director and never an officer. Phifer testified that he was very careful not to communicate the Waters' alleged threat to any stockholder, director or officer of LAP. The only employee of LAP with whom either of the Waters dealt was Phifer. No officer, director or stockholder of LAP ever testified that Phifer had the authority to enter into a contract, whether oral or written, on its behalf, much less to receive and/or react to a wrongful threat of economic harm. The site preparation contract between LAP and Wildforest's prime contractor was ostentatiously executed by LAP's president, Phifer's wife, and not by Phifer. If the Government's theory is that the Waters' threat to LAP was communicated to LAP through the apparent authority of Phifer, it never argued such a theory, and this court never attempted to explain such a theory to the jury. This court does not see how the evidence in this case could have constituted proof beyond a reasonable doubt that "both the defendants [Forrest and Ford] *did convey to LAP Construction threats* to interfere with said company's ability to obtain further work...." (emphasis supplied), as charged in the indictment. Nevertheless, because there was some evidence that Phifer acted as if he were, *in fact,* LAP, or its *alter ego,* despite his very careful separation of himself from its ownership and control, the court will not allow itself to be persuaded by the Waters' contention that there was insufficient proof of *a threat to LAP,* whether or not it was an essential element of Count One.

### Was There Proof That Interstate Commerce Was Interfered With?

■ Count One depends not only upon the allegation and proof that Forrest and Ford threatened LAP but that the threat interfered with commerce. The day has passed when Congress had difficulty in finding a sufficient nexus with commerce to furnish it a basis for enacting any piece of salutary legislation it chooses to peg on the Commerce Clause. In *U.S. v. Morrow,* 834 F.Supp. 364 (N.D.Ala.1993), this court faulted Congress for failing to make the slightest attempt to invoke the Commerce Clause as a basis for its so-called "Gun Free School Zone Act." There is an obvious difference between legislation which at least *attempts* to articulate a relationship to interstate or foreign commerce and one which is totally silent on the subject, especially when the silence is as deafening as in *Morrow. See U.S. v. Ornelas,* 841 F.Supp. 1087, 1093 n. 11 (D.Colo.1994), in which the district court dissented from itself and agreed with this court. Perhaps this is what the Government's lawyer did during the following colloquy while defendants' Rule 29 motion was being argued:

THE COURT: Well, the cases seem to be that—and this is why I'm probably going to get reversed in the *U.S. v. Morrow* case, because the commerce clause reaches out and brings in everything. And I'm talking about the thousand feet from a school, gun case.

MR. BARNETT: I don't think you are apt to get reversed on that one.

THE COURT: Well, I hope not. In that case Congress didn't even bother to mention the commerce clause.

This court knows better than to believe that the Government's counsel in this case was speaking for the Government in the *Morrow* case, or even that the Government's counsel in this case meant what he said.

In the Hobbs Act Congress did not rely on the unspoken assumption that the whole world would know that it intended to invoke its constitutional right to regulate commerce. Congress did not there make the mistake that this court thinks it made in the Gun Free School Zone Act. The Hobbs Act clearly requires that the extortionate act "obstruct, delay or affect *commerce* " (emphasis supplied), a phrase that the Eleventh Circuit and other courts have correctly translated to "interfere with commerce."

■ This court agrees with the Government that to meet its burden of proving that Forrest and Ford interfered with commerce it only had to show a *de minimis* adverse impact on interstate commerce. The Gov-

ernment desultorily attempted to meet this burden by showing that at the Wildforest site, some time after LAP's $8,000 payment to Diane, LAP parked some grading equipment that it had rented locally but which had been manufactured in states other than Alabama or in countries other than the United States. After putting this evidence under a microscope, this court is unable to detect even a hint or a gleam of interference with interstate commerce. As a matter of pure logic, if the Government were not required to prove interference with commerce, then there would be no need for it to allege interference. All of LAP's rented equipment had been situated in Alabama for a very long period of time and had not crossed a state line in years. The Government apparently contends that if any piece of equipment used by LAP, either before or after the $8,000 payment on July 13, 1993, had ever in history crossed a state line or an international boundary, no matter how far distant in the past, this threat adversely affected commerce. This court cannot make this connection. This court can see how breathing or spending a buck could be said to affect commerce, but such actions would be too remote to constitute interference with commerce, that is unless *everything* that moves or breathes is automatically deemed to affect commerce, making any proof redundant. Additionally, the effect must be *adverse* if it is to constitute a Hobbs Act violation.

■ Within a few weeks from now this court would not be surprised to find jay walking on the list of federal offenses. A run-over pedestrian undoubtedly might constitute a greater interference with traffic than anything reflected in the evidence in this case. This court agrees with *U.S. v. Blair,* 762 F.Supp. 1384 (N.D.Cal.1991), in which that court said:

In extending federal jurisdiction over extortionate acts covered by the Hobbs Act, Congress manifested a purpose "to use all the constitutional power Congress has to punish interference with interstate commerce by extortion...." *United States v. Bagnariol,* 665 F.2d 877, 894 (9th Cir.1981) (per curiam), *cert. denied sub nom. Gallagher v. United States,* 456 U.S. 962, 102

S.Ct. 2040, 72 L.Ed.2d 487 (1982) (quoting *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960)). As a result, "[t]he Hobbs Act definition of commerce is coextensive with the constitution definition." *United States v. Hanigan,* 681 F.2d 1127, 1130 (9th Cir.1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983). *Yet even this broad mandate does not relieve the government of the burden of demonstrating that interstate commerce was indeed affected by Blair's extortionate act. This nexus between the extortion and interstate commerce may be de minimis, Battaglia v. United States,* 383 F.2d 303, 305 (9th Cir.1967), *cert. denied,* 390 U.S. 907, 88 S.Ct. 817, 19 L.Ed.2d 874 (1968), *but it must nonetheless exist. United States v. Elders,* 569 F.2d 1020, 1024 (7th Cir.1978). *An examination of the facts of this case shows that no such nexus is present.*

\* \* \* \* \* \*

*The court simply notes that the one-time simple purchase of an item which has already "come to rest" inside a state would not automatically provide an effect on interstate commerce.*

762 F.Supp. at 1388, 1392–93 (emphasis supplied). For aught appearing, the locally rented equipment here used by LAP to perform its sub-contract is still being used by LAP to perform its sub-contract, and the equipments' lessor is still enjoying the rentals without interruption. There was no evidence that LAP itself has ever done any business across a state line. Now that LAP is more likely to make a good profit on the Wildforest job, it may be able to rent equipment recently manufactured in France, and, thus, can contribute to the improvement of commerce. If Congress had intended that any threat of economic harm, necessarily and in all instances, shall equal interference with commerce, surely it would have said so. In this case the petit jury had no more than the grand jury had by way of evidence of an effect on commerce, much less an adverse effect. Speculation and conjecture on this subject cannot substitute for proof beyond a reasonable doubt.

*Was There a Fatal Variance?*

Count One charges, *inter alia,* that Forrest and Ford *were partners* in the Wildforest venture. The Government clearly failed to prove this allegation. However, the court deems this allegation immaterial to the indictment so that the Government was not required to prove it. The Waters simply were not prejudiced by this lack of proof. Therefore, the court does not find this evidentiary absence any reason for an acquittal.

### COUNT TWO

■ The Rule 29 motion as aimed at Count Two, the money laundering count, presents an easier question for the court, particularly as to Diane. Count Two, which was framed under 18 U.S.C. § 1956(a)(1)(B)(i), alleges that all three defendants "did knowingly and wilfully conduct and attempt to conduct a financial transaction, to wit: the encashment of an eight thousand ($8,000) dollar check dated July 13, 1993, which involved the proceeds of a specified unlawful activity, that is, the interference of [sic] interstate commerce as defined in Title 18 United States Code, Section 1951(a) that is the extortion of eight thousand dollars from LAP Construction, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the money involved in the financial transaction, represented the proceeds of some form of unlawful activity."

It is obvious, and is conceded by the Government, that a conviction under Count One is the *sine qua non* for a conviction under Count Two. In other words, if the Waters did not obtain money by the form of extortionate conduct described in Count One, there was no money from a "specified unlawful activity" to have been laundered by the alleged laundress or launderers.

Count Two obviously tracks the laundering statute's language, which reads, in pertinent part:

§ 1956. Laundering of monetary instruments

Whoever, *knowing* that the property involved in a financial transaction represents the proceeds of *some form of unlawful activity,* conducts or attempts to conduct such a financial transaction which in fact involves the *proceeds of specified unlawful activity—*

\* \* \* \* \* \*

(B) *knowing* that the transaction is *designed* in whole or in part—

(1) to *conceal* or *disguise* the *nature,* the *location,* the *source,* the *ownership,* or the *control* of the *proceeds of specified unlawful activity;*

\* \* \* \* \* \*

As used in this section—

(1) the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

\* \* \* \* \* \*

(7) the term "specified unlawful activity" means—

\* \* \* \* \* \*

(A) any act or activity constituting an offense listed in section 1961(1) of this title [referring to 18 U.S.C. § 1961(1)]
. . .

(emphasis supplied).

18 U.S.C. § 1961(1) provides in pertinent part:

§ 1961. Definitions

As used in this chapter—

\* \* \* \* \* \*

(1) "racketeering activity" means . . .

(B) *any act which is indictable under* any of the following provisions of *title 18 . . .*

*section 1951* (relating to interference with commerce, robbery, or *extortion*). . . .

(emphasis supplied).

This indictment, and the evidence to support it, narrows the focus of the "unlawful activity" of which Diane was allegedly aware when she cashed this particular $8,000 check. In this case the "unlawful activity" and the "specified unlawful activity" merge. They are necessarily one and the same. During argument on the Rule 29 motion, the following colloquy took place:

THE COURT: Well, does she [Diane] know—In what respect? And we get back to specific intent that it's unlawful. Does she know the extortionate scheme?

MR. BARNETT: She knows that she is aiding and abetting an unlawful activity.

THE COURT: And that's all you have to prove? I want to make sure I understand. All you've got to prove is that she knows that what she's doing is unlawful, and that she's aiding and abetting some unlawful activity. And that's enough. Is that what you are saying?

MR. BARNETT: I don't think that's what I'm saying. It came close.

THE COURT: Well, narrow it down or expand on it either way, but tell me exactly what it is that you have to prove and that you have proven so far as that lady is concerned. What do you have to prove and have you proven it?

(Discussion off record.)

THE COURT: Knowingly and willfully attempted to conduct the financial transaction—namely, the cashing of an $8,000 check—which involved the proceeds of a specified unlawful activity.

Now, what is the specified unlawful activity that she willfully and knowingly attempted to aid and abet? You've got to be specific now because you said "specified." What is it?

MR. BARNETT: Well, the specified unlawful activity obviously is the extortionate obtaining of funds.

THE COURT: But she doesn't have to know that.

MR. BARNETT: She's aiding and abetting two guys who do know, the evidence has shown. The evidence has not shown that she knows.

THE COURT: She's vicariously liable for having associated with and being the secretary for people even though she doesn't know. She just knows they are crooked. She doesn't know how crooked or in what respect they are crooked. She knows they are crooked though and she's aiding and abetting them, but she doesn't know exactly what the activity is that they are crooked in doing. I think that's what you are saying.

MR. BARNETT: I think that's the state of the evidence and I think that's the state of the evidence before the Court. The only thing we've got that shows she's involved is she knows it's not her money. She knows that it's got a bad purpose. That mental intent is shown by how she continues with the bogus story when the FBI comes out and talks to her, and then she goes to the truth when they say we don't believe that. So she's got to cover. she has general knowledge that it was an illegal sum, but she does not have specific knowledge from the state of the evidence as to what the source was.

The Government offered no evidence which could, by logical inference or otherwise, lead to a conclusion that Diane, who was simply the Waters' secretary, *knew* that the Waters had directed an extortionate threat at LAP prior to LAP's representative's delivering to Diane the $8,000 check made payable to her, and which, without dispute in the evidence, she listed as personal income in her subsequent federal income tax return.

■ As against Diane the Government relies exclusively, as it must, on the fact that she told inconsistent stories to the FBI and/or at trial and, hence, she must be lying. The surprise interview of Diane by the FBI was conducted in a small room by two agents positioned between Diane and the door. Despite this arguably custodial setting, Diane was given no *Miranda* warning and, instead, was unequivocally told that she was not a target. Diane's inconsistencies, taken alone, could not lead a reasonable jury to conclude

that Diane was aware of an extortionate scheme or *knew* that this particular $8,000 was obtained from *felonious* conduct by her bosses.

At least two other defects exist in the Government's theory as against Diane. First, Count Two specifically charges that Diane knew about *this particular* extortionate scheme. It would be incongruous and anomalous for Diane to be found guilty of *knowingly* laundering extorted money when there was no proof that she *knew* anything about any extortionate activity. Second, if the prosecution need not prove what it actually alleges and, instead, must only prove that the laundress knew that the money came from *some sort* of *felonious* activity, there was still no proof here, much less proof beyond a reasonable doubt, that Diane had any idea that her $8,000 check was the product of a felony. No proof was presented that Diane *suspected*, much less *knew*, that the Waters had committed a *misdemeanor*, much less a *felony*. The fact that Diane gave conflicting statements under the stress of a sudden and unexpected FBI two-teaming interview, taken by itself, simply cannot form a basis for a jury's finding beyond a reasonable doubt that she knew that this particular $8,000 was the product of an extortionate threat or was the product of a felony. A vague suspicion by Diane of wrongdoing by her employers, if such was proven, cannot substitute for the proof required for a criminal conviction under 18 U.S.C. § 1956.

The Tenth Circuit looked carefully at this money laundering statute as recently as January 25, 1994, in *United States v. Garcia–Emanuel,* 14 F.3d 1469 (10th Cir.1994). The Tenth Circuit there said:

> [T]he government asserts that the trial court erred in granting a judgment of acquittal on the money laundering and money laundering conspiracy counts. The district court found the evidence insufficient to sustain any of these counts.
>
> * * * * * *

The core issue in *Sanders* [*United States v. Sanders,* 928 F.2d 940 (10th Cir.1991)] was the government's contention that the money laundering statute should be interpreted broadly to include all purchases made by persons with knowledge that the money used represents the proceeds of illegal activity. We rejected that argument. To so interpret the statute would, in the court's view, turn the money laundering statute into a "money spending statute." This interpretation would be contrary to Congress' expressly stated intent that the transactions being criminalized in the statute are those transactions "designed to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity."

*Sanders,* 928 F.2d at 946 (quoting § 1956(a)(1)(B)(i)).

* * * * * *

Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime. In other words, the government must prove that the specific transactions in question were designed, at least in part, to launder money, not that the transactions involved money that was previously laundered through other means. If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute.

* * * * * *

In these cases, our requirement that the jury verdicts of guilt beyond a reasonable doubt be based on substantial evidence, and *not mere suspicion, Sanders,* 928 F.2d at 944; *United States v. Ortiz,* 445 F.2d 1100, 1103 (10th Cir.), *cert. denied,* 404 U.S. 993[, 92 S.Ct. 541, 30 L.Ed.2d 545] (1971), becomes paramount. It is not enough for the government to show that a defendant probably is guilty; in our system, guilt must be proven beyond a reasonable doubt. *In re Winship,* 397 U.S. 358[, 90 S.Ct. 1068, 25 L.Ed.2d 368] (1970).

While there are many things that criminals can do with their profits that would arouse *suspicion* of an intent to launder the money, actions that are *merely suspicious* and do not provide substantial evidence of a design to conceal will not alone support a conviction. There are many ex-

amples of suspicious behavior that we have held will not, standing alone, justify a finding of a design to conceal beyond a reasonable doubt. We held in *Sanders* that the defendant's decision to register a car in his daughter's name would not alone support his conviction. *Sanders,* 928 F.2d at 946. (emphasis supplied).

In *U.S. v. Campbell,* 777 F.Supp. 1259 (W.D.N.C.1991), the district court recognized that "due process" requires more than a scintilla in order to establish proof of money laundering beyond a reasonable doubt. It there held:

> [I]n a prosecution against a party other than the drug dealer, the elements requiring (1) a purpose of concealment, and (2) knowledge of the drug dealer's activities, necessarily become intermingled. This is so because in order for *a party other than the drug dealer* [Diane] to have an intent to conceal the illegal source of the dealer's money, the *party must first know the dealer's occupation.* While all of this may seem self-evident, it is the distinction between this case and the *Sanders* case which allows the government to content *Sanders* is inapplicable.

*Campbell,* 777 F.Supp. at 1265 (emphasis supplied). The parallel between Campbell's relationship to the money he allegedly laundered and Diane's relationship to the money she allegedly laundered is obvious. In *Campbell* there was no proof that the alleged money launderer knew that the money came from a drug dealer. In the instant case the government has failed to prove that Diane knew the money came from an extorter.

Closer to home is *U.S. v. Awan,* 966 F.2d 1415 (11th Cir.1992). In finding that this money laundering statute is not impermissibly vague, the Eleventh Circuit concluded, *inter alia:*

> [T]he requirement that the government prove that a defendant *knew* that the proceeds stemmed from *felonious* activity "do[es] much to destroy any force in the argument that application of the [statute] would be so unfair that it must be held invalid," *United States v. Jackson,* 935 F.2d 832, 839 (7th Cir.1991).

*Id.* at 1424 (emphasis on the word "knew" is the court's; emphasis on the word "felonious" is supplied).

 In its post-trial brief the United States argues:

> The fact that defendant Burlingame did not know the nature of the specified unlawful activity is not of consequence . . .

The court respectfully disagrees with this statement, particularly inasmuch as in this case the "specified unlawful activity" and the "some form of unlawful activity" are precisely the same activity. If Diane *suspected* that something was amiss but did not *know* that the $8,000 paid to her represented the proceeds of extortion, no jury could logically or fairly conclude that the Government had proven beyond a reasonable doubt all of the essential elements of a violation of § 1956(a)(1)(B)(i).

Although in *Ratzlaf v. U.S.,* —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), the Supreme Court was not dealing with this particular money laundering statute, the reasoning there employed by Justice Ginsburg, speaking for the majority in discussing a similar statute, well fits the instant case. In *Ratzlaf,* the Supreme Court was dealing with 31 U.S.C. § 5313(a), which makes it illegal to structure a transaction for the purpose of evading reporting requirements and sets out criminal penalties for a person who "willfully" violates the anti-structuring provision, § 5322(a). The statute under which Diane was tried uses the word "knowing" instead of the word "willful," but these two words have a well-understood similarity. When Congress uses such a word, just as when it uses the word "wrongful" or the word "unlawful", discussed *supra,* it intends the word to be given meaning. The Court in *Ratzlaf* held:

> [W]e count it significant that § 5322(a)'s omnibus "willfulness" requirement, when applied to other provisions in the same subchapter, consistently has been read by the Courts of Appeals to *require both "knowledge of the reporting requirement" and a "specific intent to commit the crime,"* i.e., a "purpose to disobey the law." See *United States v. Bank of New England, N.A.,* 821 F.2d 844, 854–859 (CA 1 1987) ("willful violation" of § 5313's report-

ing requirement for cash transactions over $10,000 requires "voluntary, intentional, and bad purpose to disobey the law"); *United States v. Eisenstein,* 731 F.2d 1540, 1543 (CA 11 1984) ("willful violation" of § 5313's reporting requirement for cash transactions over $10,000 requires " 'proof of the defendant's knowledge of the reporting requirement and his specific intent to commit the crime' " (quoting *United States v. Granda,* 565 F.2d 922, 926 (CA 5 1978))).

\* \* \* \* \* \*

The United States urges, however, that § 5324 violators, by their very conduct, exhibit a purpose to do wrong, which suffices to show "willfulness":

"On occasion, criminal statutes-including some requiring proof of 'willfulness'—have been understood to require proof of an intentional violation of a known legal duty, i.e., specific knowledge by the defendant that his conduct is unlawful. But where that construction has been adopted, it has been invoked only to ensure that the defendant acted with a wrongful purpose. *See Liparota v. United States,* 471 U.S. 419, 426[, 105 S.Ct. 2084, 2088–89, 85 L.Ed.2d 434] (1985)....

. . . .

"The anti-structuring statute, 31 U.S.C. § 5324 satisfied the 'bad purpose' component of willfulness by explicitly defining the wrongful purpose necessary to violate the law: it requires proof that the defendant acted with the purpose to evade the reporting requirement of Section 5313(a)." Brief for United States 23–25.

" '[S]tructuring is not the kind of activity that an ordinary person would engage in innocently,' " the United States asserts. *Id.,* at 29 (quoting *United States v. Hoyland,* 914 F.2d 1125, 1129 (CA 9 1990)). It is therefore "reasonable," the Government concludes, "to hold a structurer responsible for evading the reporting requirements without the need to prove specific knowledge that such evasion is unlawful." Brief for United States 29.

Undoubtedly there are bad men who attempt to elude official reporting requirements in order to hide from Government inspectors such criminal activity as laundering drug money or tax evasion. But currency structuring is not inevitably nefarious.

\* \* \* \* \* \*

*In light of these examples, we are unpersuaded by the argument that structuring is so obviously "evil" or inherently "bad" that the "willfulness" requirement is satisfied irrespective of the defendant's knowledge of the illegality of structuring. Had Congress wished to dispense with the requirement, it could have furnished the appropriate instruction.*

—— U.S. at —— – ——, 114 S.Ct. at 659–62 (emphasis supplied). At the time the Government's lawyer was telling the grand jury that what it had just heard in five minutes was "interesting", both he and the grand jury were undoubtedly unaware of what Justice Ginsburg was saying.

Another, separate, undisputed fact leads this court by a different route to the same conclusion, namely, that the evidence here fell short of proving that Diane was any more than an inadvertent part of possible felonious activity. The two FBI interviewers made clear to Diane that she was nothing but a potential witness and certainly was not a target. The fact that Phifer, the self-interested informant wearing the body recorder, and Diane's confidant, never recorded a single conversation he had with her, reinforces the FBI's representations to her that she had nothing to worry about. If the FBI had ever had any real reason to believe that Diane was implicated in the Waters' suspected illegal activity, surely it would have instructed Phifer to record his conversations with her, just as he had recorded his wild and wooly conversations with Forrest and Ford. Phifer could easily have recorded the single most crucial conversation in the whole scenario, his conversation with Diane when he delivered the $8,000 check. How could such an, opportunity to nail both her and her bosses be resisted? Phifer could have simply taped his "thank you" to his friend, Diane, for having helped Forrest, Ford and him dis-

**1568**

guise the illegal "kickback". Voila! Surely this missed opportunity must have been more than a mere investigative lapse by the FBI. To this court it constitutes a concession by the Government not only that it did not suspect Diane, but had received no indication from Phifer that Diane was implicated or could be hauled into the net.

Diane only moved from potential witness to defendant after she failed her audition as witness. There is, of course, nothing illegal about using legitimate prosecutorial pressure to obtain favorable trial testimony, but in this case there was simply no evidentiary basis upon which to form a belief that Diane knew anything that could be of sufficient value to a possible Government's case against the Waters to justify indicting her, much less to justify the jury verdict against her for money laundering.

Diane's motion for acquittal does not rise or fall on the Waters' motion under Count One. She wins acquittal because there was no evidentiary basis for her conviction under Count Two. .

Although Count Two used the alternative language "aiding and abetting", the Government had to present the same evidence against Diane to prove "aiding and abetting" as to prove "money laundering". To "aid and abet" money laundering is to money launder and the Government never even argued its "aiding and abetting" theory to the jury.

### Conclusion

Both the jury and the court heard evidence which may have proven beyond a reasonable doubt (1) that Forrest and Ford negotiated an unconscionable or unfair side agreement, or, in other words, that the gentlemen's agreement was not between gentlemen; (2) that if HUD had known, it would not have insured a construction loan tainted by or involving such a side agreement; (3) that Ford and Forrest faked invoices that Phifer begged for to help him disguise the side agreement from LAP's officers and owners; and (4) that Forrest and Ford used extremely foul language in discussing the side agreement with Phifer. This all constituted excellent, if inflammatory, window dressing; how-

ever, none of it, separately or in the aggregate, constituted a criminal offense, much less one charged by the grand jury. If Forrest and Ford had succumbed to Phifer's request that they place the fake invoices in the United States mail, there would have been a Count Three to the indictment, and the Waters' recorded confession of "illegality" would have been a *real* confession. However, Forrest and Ford, whatever the state of their rectitude, got lucky. By happy accident, they did not commit mail fraud. The FBI mistakenly thought it had enough.

Because the evidence, construed most favorably to the Government, did not prove the essential elements of either of the offenses charged, a judgment of acquittal on both counts will be entered.